# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **TYRON HAMPTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 C 10040** |
| **v.** | ) | |
| | ) | **Magistrate Judge Sidney I. Schenkier** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Tyron Hampton has moved for reversal and/or remand of the Commissioner's decision denying his applications for a closed period of Social Security benefits (doc. # 17: Pl.'s Mot. for Summ. J.). The Commissioner has filed a cross-motion asking the Court to affirm its decision (doc. # 24: Def.'s Mot. for Summ. J.). We find that the Administrative Law Judge's ("ALJ") determination that Mr. Hampton's substance abuse disorder during the closed period was a contributing factor material to the determination of disability was supported by substantial evidence. However, due to an evidentiary gap regarding the percentage of time Mr. Hampton would have been off-task during a workday, we grant Mr. Hampton's motion to remand and deny the Commissioner's motion to affirm.

## I.

Mr. Hampton applied for disability benefits on July 25, 2007, alleging disability beginning on April 1, 2003 (R. 164-69, 170-71). After a hearing on August 13, 2010, the ALJ

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2]On December 6, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 8).

denied benefits in a written decision, and the Appeals Council denied review (R. 1-5, 19-34). Mr. Hampton filed a complaint in federal district court on October 11, 2011, and on May 23, 2012, the Commissioner agreed to a reversal and remand of the case (R. 647-48). In May 2013, the ALJ held a second hearing (R. 517-638), and on June 7, 2013, Mr. Hampton amended his disability onset date to July 1, 2008, and sought a closed period of disability benefits from that date through December 31, 2011 (R. 524, 1198).[3] On July 12, 2013, the ALJ issued an opinion again denying plaintiff's claim for benefits (R. 658-81).

Mr. Hampton sought review of this decision, and on October 24, 2014, the Appeals Council remanded the case to a new ALJ (R. 684-86). That ALJ held a hearing on March 25, 2015 (R. 618-38), and on August 10, 2015, issued a written decision denying Mr. Hampton's claim. The ALJ found Mr. Hampton was under a disability during the closed time period at issue, but that a "substance abuse use disorder [wa]s a contributing factor material to the determination of disability" such that Mr. Hampton was not considered disabled under the Social Security Act (the "Act") (R. 491). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-6). *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).

## II.

Mr. Hampton was 40 years old when he applied for benefits in July 2007 (R. 51). He has been treated at the Hines VA Hospital ("Hines") for polysubstance abuse, depression, and physical health issues since 2000 (R. 263-64). Mr. Hampton was sober for "a long period" before resuming drug use in 2007; this coincided with increased depression, anxiety, hallucinations and paranoia (doc. # 18: Pl.'s Mem. at 4). He was admitted to a substance abuse treatment program at

---

[3]At the hearing in May 2013, plaintiff's attorney stated that the amended onset date was July 26, 2007 (R. 524), but in a letter the following month, the plaintiff's attorney clarified that Mr. Hampton sought a closed period of disability benefits for the period from July 1, 2008 through December 31, 2011 (R. 1198).

Hines in June 2007, and he stayed off drugs for several months thereafter (R. 265-93, 366-400, 416-28). Mr. Hampton took Seroquel (quetiapine, an anti-psychotic) and Zoloft (sertraline, an anti-depressant), which made him feel less anxious (R. 335-37). However, during a state agency mental health examination on October 30, 2007, Mr. Hampton reported that he continued to experience depression, paranoia, suicidal ideation and auditory hallucinations (Id.).

Unfortunately, by June 2008, Mr. Hampton had resumed using heroin and cocaine, and he had stopped taking anti-depressant medication (R. 1188-89). Mr. Hampton re-entered the Hines substance abuse treatment program, and his anti-depressant medications were reinstated (Id.). On June 26, 2008, Luz Cuaresma, M.D., the attending psychiatrist, noted that the medication seemed to help alleviate Mr. Hampton's depression (R. 1191-92).

Mr. Hampton did not seek substance abuse or psychiatric treatment again at Hines until May 23, 2010. On that date, he was admitted to Hines for detoxification from cocaine and heroin abuse and treatment for depression, hallucinations, paranoia and suicidal ideation (R. 1126-27, 1183-84). Mr. Hampton reported that after his father died in the summer of 2008, he stopped going to school and started using cocaine once a week and heroin daily to self-medicate, rather than seek prescriptions for anti-depressant or anti-psychotic medication (R. 1122, 1131). He stated that the frequency and magnitude of his psychotic symptoms were heightened while using drugs, but that he also experienced them when sober (R. 1123, 1140). On May 28, 2010, Mr. Hampton was discharged with prescriptions for Seroquel and sertraline, and with plans to attend a substance abuse treatment program (R. 1124, 1136). In June 2010, however, Mr. Hampton was a "consistent no-show" for that program (R. 1134).

On July 15, 2010, Mr. Hampton met with Dr. Cuaresma (R. 1111). Mr. Hampton admitted to smoking heroin and cocaine multiple times a week since being discharged from

Hines in May 2010, and reported dysthymic (depressed) mood, loss of interest and appetite, social withdrawal and intermittent auditory hallucinations (*Id.*). Mr. Hampton stated that he had those symptoms even when he abstained from drugs (*Id.*). Dr. Cuaresma diagnosed him with polysubstance dependence and major depression with psychotic features, increased his prescription for sertraline and continued his prescription for Seroquel (R. 1111-12). On July 28, 2010, Mr. Hampton reported difficulty sleeping, weight loss and continued heroin use (R. 1107-08). Dr. Cuaresma decreased his sertraline dose, continued Seroquel, and started him on trazadone (anti-depressant and sedative) (*Id.*).

At a follow-up appointment with Dr. Cuaresma on August 9, 2010, Mr. Hampton stated that he had improved appetite, less depression, better sleep and some weight gain (R. 1106). Mr. Hampton had no more delusions or hallucinations, but he had some "thought broadcasting" (the idea that his thoughts were being broadcast from his head to the external world), for which Dr. Cuaresma increased his Seroquel dose (*Id.*). Dr. Cuaresma also started Mr. Hampton on mirtazapine (anti-depressant) (*Id.*). That day, Dr. Cuaresma filled out a medical source statement, which indicated that since July 2007, Mr. Hampton had been mildly to moderately limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation abilities, and markedly limited in his ability to maintain attention and concentration for extended periods (R. 474-76, 479). Dr. Cuaresma opined that Mr. Hampton had a "substantial loss" in the ability to respond appropriately to supervision and co-workers and in the ability to deal with routine changes in the work setting (R. 477-78).[4] The directions for the medical source statement instructed the physician not to include any limitations that he or she believed were the

---

[4]The form defined a "substantial loss" as an inability to perform an activity in "regular, competitive employment, but at best, [an ability to] do so only in a sheltered work setting where special considerations and attention are provided" (R. 477).

result of substance addiction (R. 473). Three weeks later, on August 30, 2010, Mr. Hampton admitted to still using heroin (R. 1104).

On September 9, 2010, Mr. Hampton underwent open heart surgery (R. 933). The following month, Mr. Hampton returned to Hines multiple times with complaints of chest pain, and at those visits, he admitted he continued to use heroin and cocaine (R. 916-19, 923). On November 8, 2010, Mr. Hampton appeared non-depressed to Dr. Cuaresma and reported being sober from drugs and alcohol (R. 909), but on December 20, 2010, Mr. Hampton admitted to using heroin and cocaine regularly, and he appeared mildly depressed (R. 902).

On January 7, 2011, Mr. Hampton was admitted to a residential inpatient substance abuse treatment program at Hines (R. 982, 988). His primary mental health care provider was Dheeraj Raina, M.D., who started him on a drug detoxification program with methadone (R. 980-81). Upon intake, Mr. Hampton reported snorting heroin daily and last using cocaine two weeks prior, but the intake sheet noted that "does not seem accurate given positive cocaine on urine drug screen today" (R. 988). On January 10, 2011, Mr. Hampton denied any depressive or psychotic symptoms since admission (*Id.*). On January 15, 2011, Mr. Hampton left the facility on a therapeutic day pass (R. 955). Upon his return, staff suspected that he had taken illicit drugs (*Id.*). He denied it, but his urine screening was positive for opiates (R. 939-41). On January 21, 2011, Mr. Hampton was discharged from the residential inpatient program (R. 941-42).

Mr. Hampton continued to use heroin until January 28, 2011, when he entered a 28-day detoxification program at the Salvation Army (R. 1099, 1102). In February 2011, he reported to outpatient group counseling at Hines and to Dr. Cuaresma that he was feeling good (R. 1096). Dr. Cuaresma refilled his medications and noted that his mood and affect were normal and he had no hallucinations or delusions (R. 1097).

Mr. Hampton asserts that "[o]ver the course of the year [2011], his functionality and his depressive symptoms slowly improved as he received treatment, individual and group counseling and therapy and medication" (Pl.'s Br. at 7). Mr. Hampton became a resident of the Salvation Army and returned to outpatient substance abuse recovery treatment (R. 1090, 1094). He stayed sober and complied with his medications (R. 1092-93). His sleep, appetite and mood improved, and he had no delusions, hallucinations or suicidal thoughts (R. 1084-85). Mr. Hampton still had occasional thought broadcasting, but he "learned to live with it" (*Id.*). During treatment, Mr. Hampton no longer appeared depressed (R. 1035-36).

Mr. Hampton's success with sobriety dramatically -- and positively -- affected his daily life activities. Later in 2011, Mr. Hampton moved into his own apartment, participated in vocational rehabilitation and began attending classes at Roosevelt University (*see, e.g.*, R. 1025, 1030-33, 1036-39). In October 2011, Mr. Hampton sought discharge from the substance abuse treatment program because he remained abstinent from substances and was doing well (R. 1028-29). At a follow-up appointment on November 16, 2011, Dr. Cuaresma observed that he had no depressive symptoms (R. 1025).

However, Mr. Hampton had persistent problems with concentration and memory (R. 1084-85, 1064). In July 2011, Mr. Hampton underwent a neuropsychology evaluation, which showed that he had a mild cognitive impairment within the domains of attention, working memory and higher order executive functioning, secondary to his history of polysubstance dependence and psychiatric issues (R. 1045).

On December 20, 2011, Dr. Timothy Buckley became Mr. Hampton's mental health provider at Hines (R. 1021). Dr. Buckley began tapering Mr. Hampton off his psychotropic medications (first mirtazapine, then Seroquel) because he remained sober, his mood was stable

with no current symptoms of depression, and he was functioning well (R. 1021). Dr. Buckley noted that Mr. Hampton's possible history of bipolar mood disorder and mania was "not clearly differentiated" from his history of drug use, and he opined that Mr. Hampton's polysubstance abuse and major depressive disorder were in remission (R. 1021-23). Mr. Hampton retained his prescription for trazadone to help with insomnia (R. 1013-14). By April 2012, Mr. Hampton continued to function well; he was still attending college classes, and he was working for the Illinois Department of Corrections ("IDOC") (R. 1009).

### III.

On May 21, 2013, during the second hearing in this case, Mr. Hampton testified that he had recently graduated from Roosevelt University with a degree in hospitality and tourism management (R. 526-27). He attended Alcoholics Anonymous ("AA") meetings, took medication for depression and trazadone to help him sleep, and saw his psychologist periodically (R. 527, 545, 554). Mr. Hampton testified that he still heard "auditorial signals" from radio and television, but he managed them (R. 537-38). In 2012, he had a problem with an IDOC supervisor and was let go from his job (R. 540).

The ALJ asked the vocational expert ("VE") to assume an individual who could perform medium work with the following non-exertional limitations: "unable to remember . . . and carry out detailed and complex job tasks . . . not [] suited for work that requires intense focus and concentration for extended periods and . . . only be able to have casual interaction with the general public, as well as superficial or casual contact with coworkers and occasionally be able to set goals and make plans independently of others" (R. 561). The VE testified that individual would not be able to perform Mr. Hampton's prior work, but a substantial number of other jobs

would be available, provided the individual would be on task 90 percent of the time and miss no more than one day of work per month (R. 562-64).

On March 25, 2015, at his third ALJ hearing, Mr. Hampton testified that he had not used illegal drugs since January 2011 (R. 625). He continued to take anti-depressant and anti-psychotic medication and trazadone; his depression and auditory broadcasting had not stopped, but he could "manage it better" (R. 625, 628, 631). Mr. Hampton testified that if he had not been depressed between 2007 and 2011, he "would like to think" that he would have been able to hold a job, "but [he] really do[es]n't know" (R. 625-26). He "c[ould]n't say" whether his depression had gotten better since he stopped using cocaine and opiates, "[b]ut overall since 2011, . . . since being off the dependency of drugs, yes, [his] life [wa]s better" (R. 627-28). The ALJ asked the VE "if an individual was to be off task 20 percent of the work period would there be any jobs they could perform," and the VE answered in the negative (R. 635). Mr. Hampton's attorney declined to ask any questions of the VE (R. 636-37).

## IV.

After the 2015 hearing, the ALJ sent two interrogatories to an independent medical expert, Joseph Cools, Ph.D., seeking his opinion on the severity of Mr. Hampton's mental impairments with and without substance abuse. On April 28, 2015, after reviewing Mr. Hampton's records, Dr. Cools completed the first interrogatory, which asked him to describe Mr. Hampton's impairments and rate the degree of his Paragraph B functional limitations with specific citations to the record and narrative explanations (R. 1211-17). Dr. Cools opined that while Mr. Hampton was abusing drugs and alcohol, he had marked limitations in all functional areas and was "fully-non-functional" (R. 1214-15). However, excluding his drug and alcohol abuse, Dr. Cools stated that Mr. Hampton would have mild to moderate difficulties in

maintaining social functioning and maintaining concentration, persistence or pace, moderate difficulties in activities of daily living ("ADLs"), and no repeated episodes of decompensation of extended duration (*Id.*). Specifically, Mr. Hampton would have no limitations in understanding and remembering simple instructions; mild limitations in carrying out simple instructions, making simple work related decisions, interacting appropriately with supervisors and coworkers, and responding appropriately to routine work changes; and moderate limitations in interacting appropriately with public, understanding, remembering and carrying out complex instructions, and making complex work-related decisions (R. 1218-19).

Dr. Cools wrote that the record evidence showed Mr. Hampton "functions very much better when in active treatment, abstinent from opiates, cocaine, alcohol. He has been in numerous treatment programs, and always functions much better when compliant with prescribed treatment, including abstinence from drugs and alcohol" (*Id.*). Dr. Cools further wrote that "claimant's mental status is very much affected by drug and alcohol dependence. Mental status responds to prescribed treatment including abstinence" (R. 1215). Thus, Dr. Cools concluded that Mr. Hampton's drug and alcohol abuse was "material" (R. 1219).

On July 2, 2015, Dr. Cools completed the second interrogatory, which had been submitted by Mr. Hampton's counsel. This interrogatory asked Dr. Cools whether he agreed with diagnoses Mr. Hampton had received of major depressive disorder with psychosis, and, discounting any limitations from substance abuse, how frequently during an eight-hour work day Mr. Hampton would have difficulty maintaining concentration, persistence and pace, and whether he would have been off task more than 20 percent of the time as a result of his mental impairments (R. 1226-28). Dr. Cools reiterated his earlier conclusion that the evidence showed substance abuse was a contributing factor material to Mr. Hampton's disability, and "[w]ith

discounting limitations of substance abuse, claimant should be able to concentrate and maintain persistence and pace sufficient to perform simple to semi-complex tasks" (R. 1227). Dr. Cools agreed that Mr. Hampton was diagnosed with chronic major depressive disorder with psychosis, but pointed out that Mr. Hampton was "using opiates, cocaine, alcohol" at that time and his symptoms were worse when abusing drugs (R. 1226-27). Furthermore, in response to the question of whether Mr. Hampton would have been off task more than 20 percent of the time as a result of his mental impairments and discounting his substance abuse, Dr. Cools wrote that Mr. Hampton's mental status improved when he was not actively using, and that his treating sources "are in agreement that claimant would be able to function adaptively when not using. In work related terms, he would not be off task more than 20% of the time" (R. 1227).

### V.

On August 10, 2015, the ALJ issued the written opinion now under review. The ALJ concluded that Mr. Hampton was under a disability during the closed time period at issue (July 1, 2008 to December 31, 2011), but that a "substance abuse use disorder [wa]s a contributing factor material to the determination of disability" such that Mr. Hampton was not considered disabled under the Act (R. 491). When including his substance abuse disorders, the ALJ found that Mr. Hampton met Listings 12.04 (depressive, bipolar and related disorders) and 12.09 (substance addiction disorders) and the Paragraph B criteria (R. 493-95). The ALJ noted that in June 2008, Mr. Hampton "failed to follow up with his drug rehabilitation treatment and he failed to follow up for additional treatment for almost two years," until May 24, 2010, when he was hospitalized with suicidal ideation and worsening depression after increased, daily use of heroin and cocaine (R. 494). At that time, Mr. Hampton was diagnosed with bipolar disorder with psychotic features (*Id.*). The ALJ noted that Mr. Hampton "tried to re-enroll in substance abuse cessation programs,

but repeatedly relapsed into drug use," continuing "significant" heroin use until January 2011; when he used drugs, Mr. Hampton reported symptoms of poor concentration and worsening depression (R. 494-96).

The ALJ next determined that excluding substance abuse, Mr. Hampton would still have a severe mental impairment, but he would no longer meet or medically equal a Listing or the Paragraph B criteria (R. 497). The ALJ recognized that Mr. Hampton claimed that his symptoms persisted even when he was not abusing drugs, but the ALJ noted that before 2011, Mr. Hampton had stated that his longest period of sobriety was only five months (R. 496). The ALJ found the evidence of record showed his mental health "vastly improved after he became sober in January 2011;" -- "the claimant's mood generally stabilized without suffering hallucinations or other acute symptoms when he abstained from drugs and alcohol" (R. 497).

The ALJ determined that excluding substance abuse, Mr. Hampton had moderate restriction in ADLs and social functioning, because after he became sober he functioned and lived independently, interviewed for employment, took college courses, and improved his relationships with his mother and friends, despite some continued interpersonal conflicts with coworkers and supervisors (R. 497-98). The ALJ stated that Mr. Hampton would also have moderate (not marked) difficulties in concentration, persistence or pace because he was "doing well" when sober, and "he attended AA meetings, continued with substance abuse treatment and activity [, and] sought and obtained employment" (R. 497). In addition, the ALJ found that Mr. Hampton would experience no episodes of decompensation because he never required inpatient care for any mental health disorders while sober (R. 498). The ALJ then determined that if Mr. Hampton stopped the substance use, he would have the residual function capacity ("RFC") to perform medium work:

except he would be unable to understand, remember or carry out detailed and complex job tasks; he is not suited for work that requires intense focus and concentration for extended periods; he may have only casual interaction with the general public and have superficial or casual contact with coworkers; he may only occasionally set goals and make plans independently of others; and he would be able to be on task at least 90% of the time in an 8-hour workday.

(R. 498-99).

The ALJ explained that during Mr. Hampton's period of sobriety in late 2007 and early 2008, he denied suffering from any hallucinations, suicidal ideation or difficulty controlling his behavior when he was not abusing drugs or alcohol, though he remained depressed (R. 499-500). Likewise, the ALJ noted that after several days of forced sobriety and medication in October 2010 during his hospitalization for heart surgery, Mr. Hampton's mood appeared stable without hallucinations, his thought process was logical and organized, and he had adequate concentration (R. 501-503). The ALJ contrasted Mr. Hampton's improved mental state while he was sober to periods in 2008 and 2010, when Mr. Hampton admitted to significant and repeated illegal drug use and his depression worsened, his concentration decreased, and he had hallucinations (R. 493-96, 500).

In addition, after Mr. Hampton achieved sobriety in 2011, the ALJ pointed to evidence demonstrating that Mr. Hampton's mental health issues and functioning were much improved, including: (1) a July 2011 neuropsychological examination showing Mr. Hampton had only "mild cognitive impairment, likely due to his polysubstance abuse and underlying psychiatric issues" and noting Mr. Hampton stated that "his current mood was balanced with six months of sobriety and regular psychiatric medication;" (2) Mr. Hampton's enrollment in college classes and his employment with IDOC; (3) Dr. Cuaresma's November 16, 2011, examination showing Mr. Hampton's mood was stable with no depressive symptoms, suicidal ideation or hallucination, and noting Mr. Hampton lived independently, remained sober and compliant with

medications, and had good sleep, appetite and concentration; and (4) Dr. Buckley's December 20, 2011 examination, at which Mr. Hampton reported his mood was stable when he abstained from substance abuse and took medication, and Dr. Buckley opined that Mr. Hampton's polysubstance abuse and major depressive disorder were in remission (R. 501-02).

The ALJ "reject[ed]" Dr. Cuaresma's medical source statement from August 9, 2010, which opined that even when he was not abusing drugs and alcohol, Mr. Hampton had marked limitations in his ability to maintain concentration for extended periods, mild to moderate limitations in other Paragraph B areas, and a "substantial loss" in the ability to respond appropriately to supervision and coworkers and to deal with changes in routine work settings (R. 502). The ALJ reasoned that the August 2010 opinion deserved "little weight" because it was contradicted by Dr. Cuaresma's own treatment notes, which showed that when Mr. Hampton was not abusing drugs, his mood and functionality were improved and he did not show the type of clinical abnormalities one would expect if he were disabled when not abusing drugs (R. 502-03). In addition, the ALJ found that other treating doctors did not find Mr. Hampton's symptoms as severe as Dr. Cuaresma's August 2010 opinion when Mr. Hampton remained sober: for example, the October 2010 psychiatric examination while Mr. Hampton was hospitalized and sober (R. 503). Furthermore, the ALJ found Mr. Hampton's own activities while sober -- such as maintaining his own apartment and attending college classes -- were inconsistent with Dr. Cuaresma's August 2010 opinion that the severe limitations he found existed irrespective of Mr. Hampton's substance abuse (*Id.*).

The ALJ gave "great weight" to Dr. Cools' mental health assessment, which determined that Mr. Hampton had "only moderate limitations when not abusing drugs or alcohol" (R. 502, 504). The ALJ recognized that Dr. Cools was a non-examining physician, but reasoned that Dr.

Cools was "familiar with the record as a whole" and made findings that were consistent with the objective medical evidence of record and with Mr. Hampton's ADLs (R. 504).

Relying on the VE's testimony at the May 2013 hearing, the ALJ determined that Mr. Hampton could not perform any of his past relevant work, but without the impact of his substance use, there were a significant number of jobs in the national economy that he could perform during the closed period (R. 504-05). Ultimately, the ALJ determined that "[t]he substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use. Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act . . ." (R. 506, internal citations omitted).

## VI.

Our review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "We will uphold that decision if it is supported by substantial evidence in the record," *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017). "An ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan*, 865 F.3d at 563.

There is no dispute here that when taking into account his substance abuse, Mr. Hampton was disabled from July 1, 2008 to December 31, 2011. However, under the Act, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a

contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). In determining whether substance abuse was a contributing factor material to disability, the ALJ must "adequately disentangle[] the effects of [the claimant's] drug abuse from those of h[is] other impairments." *Harlin v. Astrue*, 424 F. App'x 564, 568 (7th Cir. 2011).

Mr. Hampton raises two challenges to the ALJ's determination. *First*, he contends that the ALJ erred in finding that substance abuse was a contributing factor material to his disability. *Second*, he argues that the ALJ erred in applying the VE testimony and in determining the amount of time Mr. Hampton would have been able to remain on task during an eight-hour workday. We address each challenge in turn.

## VII.

Initially, we consider which party bears the burden of proving that substance abuse was a contributing factor material to the finding of the claimant's disability. In *Harlin*, 424 F. App'x at 567, the Seventh Circuit stated that the claimant bears the burden of proving that substance abuse was not a contributing factor. However, as Mr. Hampton points out (Pl.'s Br. at 25 and n.7), *Harlin* was an unpublished case, and the question of who bears the burden of proof on this issue has been subject to some debate in this Circuit. Most courts in this Circuit have followed the standard applied in *Harlin*. *See, e.g., Negron v. Colvin*, No. 15 C 4156, 2017 WL 985642, at *6 (N.D. Ill. Mar. 14, 2017); *Komperda v. Colvin*, No. 13 C 4060, 2015 WL 639192, at *6 (N.D. Ill. Feb. 13, 2015); and *Richardson v. Astrue*, No. 11 C 7080, 2013 WL 427125, at *9 n.3 (N.D. Ill. Jan. 31, 2013) (collecting cases). However, at least one court in this district has disagreed, and assigned the burden to the Commissioner. *See Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1094 (N.D. Ill. 2012) (discussing a split among other Circuits).

In this case, we need not determine which party bears the burden of proof. Regardless of who bore that burden, the ALJ's determination that Mr. Hampton's substance abuse disorder was a contributing factor material to his disability was supported by substantial evidence.

## A.

Mr. Hampton first raises what he calls the "procedural oddit[y]" in the ALJ's decision to send written interrogatories to a medical expert rather than have the expert testify at the hearing (Pl.'s Mem. at 15-16). We do not find anything improper in that decision.

The medical expert reviewed the entire record, and his attorney was allowed to submit written questions to the medical expert.[5] We disagree with Mr. Hampton's contention that the medical expert's determination as to whether he would have been disabled even without substance abuse would have "benefit[ed] from his direct observation of plaintiff" (Pl.'s Mem. at 16). Plaintiff does not explain how Dr. Cools would have benefited in his assessment of Mr. Hampton's abilities during the closed period ending in 2011 by seeing him during the 2015 hearing, after he had been sober for years.

## B.

The centerpiece of Mr. Hampton's argument is that the ALJ erred in giving little weight to Dr. Cuaresma's August 2010 opinion (Pl.'s Mem. at 17-21). He argues that Dr. Cuaresma's opinion should be given "controlling weight" under the treating physician rule, and that the ALJ did not provide a sound explanation for his decision not to do so here (*Id.* at 19).

"Under the Treating Physician Rule, a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. When

---

[5]Although Mr. Hampton contends that Dr. Cools had not seen "all the evidence" (doc. # 26: Pl.'s Reply at 3), that contention is contrary to the record. Dr. Cools stated that he reviewed all the medical evidence in the written record through the date of his opinion, Exhibits 1F through 21F (R. 1226).

controlling weight is not given, an ALJ must offer good reasons for doing so . . ." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (internal quotations and citations omitted). "An ALJ may discount a treating physician's medical opinion that is internally inconsistent or inconsistent with that of a consulting physician, so long as []he minimally articulates h[is] rationale." *Stevenson v. Colvin*, 654 F. App'x 848, 853 (7th Cir. 2016).

Mr. Hampton advances several reasons for why the ALJ erred by not giving controlling weight to Dr. Cuaresma's August 2010 opinion. We disagree with each of them.

*First*, Mr. Hampton contends that the ALJ impermissibly played doctor when he discounted Dr. Cuaresma's opinion (Pl.'s Mem. at 20). We disagree. The ALJ relied on evidence in the medical record to determine that, contrary to Dr. Cuaresma's opinion, Mr. Hampton's mood and functionality were largely improved when he was not abusing drugs. The ALJ reviewed medical reports from the time periods when Mr. Hampton was abusing drugs -- including the summer of 2010 when Dr. Cuaresma completed her opinion -- and compared them to medical reports from the periods when Mr. Hampton was sober (R. 502-03). The ALJ found that when he was taking drugs, Mr. Hampton was hospitalized multiple times for extreme symptoms, including hallucinations, delusions and suicidal ideation. By contrast, when he was sober, medical reports -- including some from Dr. Cuaresma -- showed Mr. Hampton's mood was stable and he was functioning well (*Id.*). The ALJ's analysis was proper; "[o]ften, evidence from a period of abstinence is the best evidence for determining the relationship between [substance] use and other impairments." *Komperda v. Colvin*, No. 13 C 4060, 2015 WL 639192, at *6 (N.D. Ill. Feb. 13, 2015) (citing SSR 13-2p: Evaluating Cases Involving Drug Addiction and Alcoholism ("DAA")).

*Second*, Mr. Hampton contends that the ALJ ignored or "cherry-pick[ed]" evidence that he continued to have some thought broadcasting while he was sober (Pl.'s Mem. at 20-21). To the contrary, the ALJ looked at the record as a whole, and properly relied upon "[m]onths of progress notes indicat[ing] the Claimant's improvement after he stopped abusing [drugs]." *Poremba v. Colvin*, No. 11 C 50091, 2014 WL 28818, at *16 (N.D. Ill. Jan. 2, 2014). The ALJ explicitly considered Mr. Hampton's complaints of some continued thought broadcasting as well as some continued depression, but determined that the evidence showed Mr. Hampton was nevertheless able to function well with medication and other treatment. The ALJ compared Mr. Hampton's functional ability -- or lack thereof -- while he was abusing heroin and cocaine to the activities Mr. Hampton was able to achieve while sober. While he was abusing substances, Mr. Hampton had multiple episodes of decompensation and needed inpatient detoxification and mental health treatment; however, when he was sober, he was able to maintain his own apartment and attend college classes (R. 502-03). Mr. Hampton's performance while sober provides substantial evidence for the ALJ's determination that Mr. Hampton's substance abuse was a "contributing factor" to his disability.

*Third*, Mr. Hampton contends that the ALJ mischaracterized the evidence of Mr. Hampton's functional capabilities while sober, specifically, the exact dates of his attending college and maintaining employment (Pl.'s Mem. at 23-24).[6] We disagree. The exact dates that Mr. Hampton attended college and worked for IDOC were not clear in the record, and the ALJ relied on evidence in the record for the dates he used. More importantly, regardless of exactly when Mr. Hampton worked at IDOC or attended Roosevelt University, the ALJ's analysis shows

---

[6]Mr. Hampton reads the ALJ's statement that Mr. Hampton "maintained" employment as meaning that he "sustained competitive employment between the summer 2007 through December 2011" (Pl.'s Br. at 23). We do not read the ALJ's language so broadly. Read in context, the ALJ was explaining that Mr. Hampton was able to seek out and obtain employment. The ALJ did not specify for how long Mr. Hampton was able to maintain that employment.

that in less than 12 months after Mr. Hampton became sober at the end of January 2011, he successfully pursued college and employment and obtained his own apartment, and by December 2011, his physician opined that his mental impairments were in remission (R. 501-02, citing R. 1021-23). Thus, we find that the ALJ "adequately disentangled the effects of [Mr. Hampton's] drug abuse from those of h[is] other impairments." *Harlin*, 424 F. App'x at 568. The ALJ's conclusion after comparing the evidence of Mr. Hampton's mental impairments and daily activities when he was sober to when he was abusing drugs was a fair one: Mr. Hampton's symptoms were less severe, and he was able to live and function well and independently when he abstained from drugs and alcohol (R. 503).[7]

## C.

In addition to challenging the weight the ALJ gave to Dr. Cuaresma's opinion, Mr. Hampton contends that the ALJ should not have given great weight to Dr. Cools' opinion because it "smack[s] of speculation and arbitrariness" (Pl.'s Mem. at 22). We disagree with this characterization of Dr. Cools' opinion. Contrary to Mr. Hampton's contentions, Dr. Cools did not merely find that Mr. Hampton "functioned better when he was abstinent" (*Id.*). Dr. Cools reviewed the entire record and cited to specific evidence in support of his conclusion that excluding his drug use, Mr. Hampton would have only mild to moderate limitations in the Paragraph B criteria during the closed time period (R. 502, 504).[8]

---

[7]Mr. Hampton also states that the ALJ "gratuitously speculated" that Dr. Cuaresma sympathized with Mr. Hampton or wrote her opinion to "avoid unnecessary doctor/patient tension" (Pl.'s Br. at 21). Mr. Hampton contends that this assertion is unsupported, and we agree. We do not endorse such speculation. However, we conclude that, in light of the substantial evidence supporting the ALJ's determination, this gratuitous remark was harmless.

[8]Mr. Hampton also takes issue with the ALJ's treatment of state agency physician opinions from late 2007 and early 2008 (Pl.'s Mem. at 22, citing R. 496-97). However, these opinions were written before Mr. Hampton's disability onset date, and the ALJ did not rely on these opinions for his determination that Mr. Hampton would not have been disabled had he not been taking drugs (*see* R. 496-97 (ALJ gave these assessments moderate weight

The ALJ may credit a medical expert's opinion over the treating physician's opinion if the ALJ "adequately explained why" he did so. *Fody v. Colvin*, 641 F. App'x 568, 572 (7th Cir. 2016). *See also Kleven v. Colvin*, 675 F. App'x 608, 611 (7th Cir. 2017) (holding that the ALJ properly supported his decision to not give controlling weight to the opinions of the claimant's treating physician because they directly contrasted with the opinions of the state agency consultative opinions, and because the limitations he described were unsupported by his own treatment notes and objective medical findings). Here, the ALJ did not err in crediting Dr. Cools' opinion over that of Dr. Cuaresma, "especially after noting that Dr. [Cools] had the opportunity to review and evaluate the entire record, whereas Dr. [Cuaresma] did not." *Poremba*, 2014 WL 28818, at *16. When Dr. Cuaresma wrote her opinion in August 2010, she had not observed Mr. Hampton sober for a period longer than five to six months. Thus, Dr. Cuaresma did not have the ability to compare Mr. Hampton's status while in the throes of substance abuse to a lengthy period of sobriety as Dr. Cools did. The ALJ did not err in crediting Dr. Cools' 2015 opinion over Dr. Cuaresma's August 2010 opinion. The ALJ's determination that Mr. Hampton's substance abuse disorder was a contributing factor material to the determination of disability was supported by substantial evidence.

## VIII.

The conclusion that the ALJ did not err in finding Mr. Hampton's substance abuse was a contributing factor material to his disability during the closed period does not end our inquiry. Mr. Hampton also contends that the ALJ erred in relying on the VE testimony from the 2013 hearing and in concluding that he would be able to be on task at least 90 percent of the time in an eight-hour workday (Pl.'s Br. at 25-28). While we find no error in the ALJ's reliance on the 2013

---

because he found "the claimant suffered more severe limitations then assessed by the DDS doctors when the claimant used drugs and alcohol")).

VE testimony, we agree that the ALJ's determination that Mr. Hampton would be on task at least 90 percent of the time was not supported by substantial evidence.

There was nothing improper in the ALJ relying on VE testimony from an earlier hearing because that is evidence of record in this case (just like the evidence of medical treatments), and the ALJ was not required to obtain supplemental evidence from a VE in 2015 (*see* R. 685, Appeals Council decision). The issue during the 2013 hearing was the same as during the 2015 hearing: whether there were a significant number of jobs available in the economy during the closed period (ending December 31, 2011) that a person with Mr. Hampton's limitations (setting aside those to which substance abuse materially contributed) could perform. So long as the hypothetical question to the VE in 2013 adequately accounted for Mr. Hampton's limitations, there was no error in the ALJ relying on it.

However, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (internal citations and quotations omitted). In 2013, the ALJ asked the VE to assume an individual who could perform medium work but was unable to remember and carry out detailed and complex job tasks, was not suited for work that requires intense focus and concentration for extended periods, and would only be able to have casual interaction with the general public and coworkers (R. 561). The VE testified that this individual could perform a significant number of jobs in Illinois "consistent with the DOT [Dictionary of Occupational Titles]" (R. 562-63).[9] In a follow-up question, the ALJ asked the VE "what is the on task time required for the performance of these jobs," to which the VE responded "90 percent" (R. 563).

---

[9] Mr. Hampton argues, without any explanation, that the VE "also did not identify the source or sources" of jobs available (Pl.'s Br. at 26). To the contrary, the VE identified her source as the DOT.

In the 2015 opinion, the ALJ assigned Mr. Hampton an RFC with the same limitations posed in the hypothetical given to the VE in 2013, and included that Mr. Hampton "would be able to be on task at least 90% of the time in an 8-hour workday" (R. 498-99). Mr. Hampton argues that "there is no medical basis to support" any of the non-exertional limitations (Pl.'s Br. at 26-27). We agree with Mr. Hampton only to the extent that he contends there was "no substantial evidence supporting the limitation that the claimant would be off task no more than 10% of the time" (doc. # 26: Pl.'s Reply at 3).

The ALJ relied on Dr. Cools' opinion, which determined that "[w]ith discounting limitations of substance abuse, claimant should be able to concentrate and maintain persistence and pace sufficient to perform simple to semi complex tasks," because he would have mild to moderate (and not marked) difficulties in maintaining social functioning, maintaining concentration, persistence or pace and in ADLs (R. 1227, 1232). Dr. Cools' opinion supports the following non-exertional limitations that were posed in a hypothetical to the VE in 2013 and included in Mr. Hampton's RFC in the 2015 opinion: unable to remember and carry out detailed and complex job tasks, unsuited for work that requires intense focus and concentration for extended periods, and only able to have casual interaction with the general public and coworkers (R. 561).

However, in response to the interrogatory from Mr. Hampton's attorney, Dr. Cools further stated that when Mr. Hampton was not actively abusing drugs, "he would not be off task more than 20% of the time" (R. 1227). While this answer does not preclude the possibility that Mr. Hampton would be off task only 10 percent of the time, it also does not preclude the possibility that he could be off task more than 10 percent but less than 20 percent of the time. As such, Dr. Cools' opinion does not provide support for the ALJ's conclusion that Mr. Hampton

22

"would be able to be on task at least 90% of the time in an 8-hour workday," and the ALJ does not point to other evidence in support of that limitation (R. 498-99).[10] *See, e.g., Lanigan*, 865 F.3d at 563 (holding that the ALJ's hypothetical was not supported by substantial evidence where the ALJ had no basis to conclude that the claimant would not be off task more than 10 percent of the time). Because the ALJ did not adequately support his determination that Mr. Hampton would be able to be on task at least 90 percent of the workday, we must remand this case.

## CONCLUSION

We intend nothing in this opinion to diminish the hard work and amazing success that Mr. Hampton and his team at the VA have achieved in his efforts to stay sober. We commend Mr. Hampton on his efforts and wish him continued success in his future endeavors. We recognize how difficult it must be to overcome a drug addiction, and we note that there is a movement to treat opioid addiction as a "bona fide illness" or disease. *See, e.g.,* Anna Lembke, *Why Addiction Should Be Considered a Disease*, 57 Judges' Journal 4, 4 (Winter 2018). However, under the Social Security Act's guidelines, the ALJ did not err in determining that Mr. Hampton's substance abuse disorder was a contributing factor material to the determination of

---

[10]The VE's testimony in 2015 also does not support this conclusion, because the ALJ asked only "if an individual was to be off task 20 percent of the work period would there be any jobs they could perform," and the VE answered in the negative (R. 635).

his disability. Nevertheless, due to the evidentiary gap regarding the percentage of time Mr. Hampton would have been off-task during a workday, we grant Mr. Hampton's motion to remand (doc. # 17) and deny the Commissioner's motion to affirm (doc. # 24). We remand this case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

Sidney I. Schenkier
**United States Magistrate Judge**

**Dated: February 21, 2018**